RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0192p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

KELLY JANE RHODES,

        *Plaintiff-Appellant*,

*v.*

STATE OF MICHIGAN, et al.,

        *Defendants*,

PAUL MCPHERSON; RICHARD JONES,

        *Defendants-Appellees*.

> No. 20-1246

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:17-cv-12416—Terrence George Berg, District Judge.

Argued: April 29, 2021

Decided and Filed: August 24, 2021

Before: DAUGHTREY, MOORE, and THAPAR, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Amy J. DeRouin, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellant. James T. Farrell, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:** Amy J. DeRouin, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellant. James T. Farrell, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

      MOORE, J., delivered the opinion of the court in which DAUGHTREY, J., joined, and THAPAR, J., joined in part. THAPAR, J. (pp. 26–40), delivered a separate opinion dissenting in part.

———————————————

**OPINION**

———————————————

KAREN NELSON MOORE, Circuit Judge.   While incarcerated and working as a laundry porter at Women's Huron Valley Correctional Facility ("WHVCF"), Kelly Rhodes suffered a severe skull fracture and other injuries when an industrial laundry cart—weighing as much as 400 pounds—fell from the truck from which it was being unloaded and struck her. Rhodes brought suit under 42 U.S.C. § 1983, seeking damages against the State of Michigan, the Michigan Department of Corrections ("MDOC"), and various individuals for their roles in the incident, alleging, inter alia, violations of the Eighth Amendment and substantive due process. After Rhodes voluntarily dismissed the other defendants, the district court granted summary judgment on the basis of qualified immunity to Richard Jones, an MDOC employee who was driving the laundry truck, and Paul McPherson, a WHVCF officer who was operating the truck's hydraulic lift gate when the incident occurred.   For the reasons that follow, we **REVERSE** in part, **AFFIRM** in part, and **REMAND** for further proceedings.

**I.  BACKGROUND**

Incarcerated at WHVCF since May 2013, Rhodes began working as a laundry porter in October 2015.   On October 15, 2015—Rhodes's second day of work as a laundry porter—she suffered skull and facial fractures, brain injuries, internal bleeding, and further injuries to her face, scalp, and left side when a laundry cart fell onto her from the truck that she was unloading. *See* R. 55-2 (Rhodes Dep. at 66) (Page ID #641).  Jones, a driver for the MDOC, was operating the truck, which carried the prison's clean and dirty linens to and from an external laundry facility.   R. 55-4 (Jones Dep. at 12) (Page ID #677).   McPherson, a MHVCF officer, was operating the truck's hydraulic lift gate from the side of the truck. *See* R. 55-5 (McPherson Dep. at 24, 29–30) (Page ID #719, 724–25).   Two other laundry porters, Anthernett Thomas and Tabitha Parker, were working with Rhodes and witnessed the incident.   R. 55-3 (Thomas Dep. at 31) (Page ID #666).   The laundry carts used to transport linens at WHVCF are large plastic bins that are approximately 3 feet by 4 feet wide, vary in height between 3 and 6 feet, and weigh

between 50 and 400 pounds, depending on how much laundry they are holding. *See* R. 55-4 (Jones Dep. at 15–17, 21) (Page ID #678–80).

There is little, if any, formal procedure for the unloading and loading of laundry trucks at MHVCF or for training new laundry porters like Rhodes. *See* R. 55-5 (McPherson Dep. at 42–45) (Page ID #737–40) ("There's no set procedure . . . for the swapping of laundry carts. So I'm afraid I had to improvise."). As Jones describes the process, he would drive the laundry truck through the prison's gates and then back the truck into a sally port within MHVCF, where the laundry porters would be present. R. 55-4 (Jones Dep. at 10–12) (Page ID #677). If he came in to drop off clean linens, Jones would enter the trailer and push or pull (depending on what was most comfortable at the time) the full laundry carts to the rear of the trailer. *Id.* at 18–19, 21 (Page ID #679–80). Jones would then push the laundry cart onto the lift gate, with a laundry porter waiting below in the sally port with their hands up to steady the loaded cart. *Id.* at 21, 34–35 (Page ID #680, 683). Only after Jones assured that the laundry porter had the cart secured—by asking something like "Do you have it?" and receiving an affirmative response— would he let go of the cart. *Id.* at 30 (Page ID #682). McPherson would say "up" or "down" to signal that the lift gate was being raised or lowered, *id.* at 36 (Page ID #683), and would shout "ready" to make sure that the laundry porters were looking at the truck and prepared to control the carts as he lowered the lift, *see* R. 55-5 (McPherson Dep. at 24–25) (Page ID #719–20). The laundry porters would then hold the carts in place as McPherson lowered the lift. *Id.* at 28 (Page ID #723). McPherson would not move the lift until the carts were controlled in order to make sure that the carts did not tip over onto one of the laundry porters. *Id.* at 28 (Page ID #723). Once the carts were unloaded from the laundry truck, laundry porters would take the carts into their units of the prison to unload the laundry. *See* R. 55-2 (Rhodes Dep. at 63) (Page ID #640).

Rhodes has no memory of the day that she was injured, *id.* at 56–57 (Page ID #638–39), and the various witnesses paint different pictures of what occurred.

***Jones*** testified that he pulled a loaded cart to the lift gate where Rhodes was waiting as usual for the laundry porters, but he admits that he did not ask whether she had control before letting go of the cart. R. 55-4 (Jones Dep. at 30–31) (Page ID #682). He believes that Rhodes did have control of the cart before it fell but then "for whatever reason, [Rhodes] quit caring and

. . . let go of the cart." *Id.* at 33 (Page ID #683). This occurred just after McPherson said "down" to indicate that the lift was being lowered. *Id.* at 36–37 (Page ID #683–84). After releasing the cart, Jones turned around and began moving towards the back of the truck to retrieve another laundry cart. *Id.* at 33 (Page ID #683). Thus, he did not see the cart tip onto Rhodes. *See id.*

*McPherson* denies that he had started to move the lift down before the laundry cart tipped over onto Rhodes. R. 55-5 (McPherson Dep. at 56–57) (Page ID #751–52). He testified that, as usual, he shouted "ready" to ensure that the laundry porters knew to steady the carts so that he could safely lower the lift gate. *Id.* at 24 (Page ID #719). However, he claims that Rhodes was looking to her left when the cart struck her, and he cannot remember whether she had her hands up to control the cart as it lowered. *See id.* at 22, 41, 53 (Page ID #717, 736, 748). The cart tipped over onto Rhodes, knocking her to the concrete, and causing her to strike her head against the concrete, with the cart landing on her legs. *Id.* at 37 (Page ID #732). Rhodes was initially unresponsive but still breathing, although she "was bleeding profusely from her nose and the left side of her head." *Id.*; *see also* R. 55-7 (McPherson Report at 1) (Page ID #767).

According to **Thomas**, Jones was in a rush that day because he was running late and "flung" the cart at Rhodes without making sure that she had control of it as he usually did. R. 55-3 (Thomas Dep. at 34–35, 42) (Page ID #667, 669). The cart was going too fast and was already tilting when it reached Rhodes. *Id.* at 34, 42 (Page ID #667–69). At one point, Thomas testified that the lift gate had not yet been lowered when the cart began to fall onto Rhodes, *id.* at 34 (Page ID #667), but she later testified that the lift "was coming down" when the cart "came off," *id.* at 53 (Page ID #672). Either way, Thomas saw the cart tipping and told Rhodes to let it go and move out of the way as Thomas and Parker had previously instructed Rhodes to do if a cart began to tip. *Id.* at 34–35 (Page ID #667). Despite the instruction, and perhaps because she panicked, Rhodes moved forward instead of back and was struck by the cart, knocking her to the concrete. *Id.* at 34–35, 43 (Page ID #667, 669). Thomas testified that after the incident occurred McPherson and Jones were arguing back and forth about whose fault it was. *Id.* at 43 (Page ID

#669).  McPherson seemed frantic; he told Thomas and Parker to leave, and they were escorted away from the sally port.  *Id.* at 35–36, 42–43 (Page ID #667, 679).

Although their accounts differed, everyone involved agrees that laundry-porter work is dangerous.  Jones testified that "everyone knew" that being a laundry porter was dangerous and that a laundry porter could be injured if a heavy cart fell on them.  R. 55-4 (Jones Dep. at 34–35) (Page ID #683).  Indeed, Jones further testified that he would never be "that careless as to push a cart straight out of a trailer and just let it go" because it would pose a substantial risk of harm.  *Id.* at 28–29 (Page ID #681–82).  McPherson testified that the carts posed a substantial risk of harm to the laundry porter if the cart was being moved carelessly.  R. 55-5 (McPherson Dep. at 20–21) (Page ID #715–16).  Thomas testified that the heavy carts can be dangerous, and that the laundry truck driver would know that.  R. 55-3 (Thomas Dep. at 39) (Page ID #668).  Indeed, Thomas testified that laundry carts had fallen from the laundry truck during unloading on multiple occasions before Rhodes's incident.  *Id.* at 45–46 (Page ID #670).

Despite the danger, Rhodes received only limited, on-the-job training to be a laundry porter.  *See* R. 55-2 (Rhodes Dep. at 59) (Page ID #639); *see also* R. 55-3 (Thomas Dep. at 14–15, 49–50) (Page ID #662, 671); R. 55-5 (McPherson Dep. at 42–43) (Page ID #737–38).  Indeed, McPherson said that he had a problem with the fact that there was no formal procedure for laundry-porter duties, testifying that there were "written guidelines for every post and every duty around [MHVCF], but there was nothing for the swapping of laundry carts."  R. 55-5 (McPherson Dep. at 43–45) (Page ID #738–40).  And the laundry truck that Jones used did not have what the parties referred to as a "stopper"—a device to hold the laundry carts in place on the lift gate so that the carts would not tip over while the laundry porters unloaded them—even though Jones and the other drivers felt as though "it would be in the best interest safety-wise."  R. 55-4 (Jones Dep. at 14–15) (Page ID #678); *see* R. 55-5 (McPherson Dep. at 44) (Page ID #739) ("I always thought it was dangerous that there was no stopper there . . . .");  R. 55-3 (Thomas Dep. at 14–15) (Page ID #662).

Rhodes filed suit on July 26, 2017.  Her First Amended Complaint asserts state and federal claims against various Michigan officials, including Jones and McPherson.  *See generally*

R. 29 (First. Am. Compl.) (Page ID #224).[1]    In Counts I and III, Rhodes alleges that the defendants violated her Eighth Amendment right against cruel and unusual punishment based on the unsafe nature of her prison work environment, their failure to train her properly as a laundry porter, and their failure to protect her. *Id.* at ¶¶ 39–49, 59–72 (Page ID #232–39, 246–53).    In Counts II and IV, Rhodes alleges that the defendants violated her substantive-due-process rights on the theories that their actions contributing to her injuries infringed on her right to bodily integrity and ran afoul of the state-created-danger doctrine. *Id.* at ¶¶ 50–58, 73–85 (Page ID #239–46, 253–60).    In Counts V–VIII, Rhodes asserts state-law claims for, inter alia, negligence and battery. *Id.* at ¶¶ 86–114 (Page ID #260–73).    The district court dismissed Rhodes's state-law claims with prejudice pursuant to a joint stipulation of the parties. R. 51 (Order at 1–2) (Page ID #579–80).

On April 23, 2019, the defendants filed a motion for summary judgment on Rhodes's federal claims, arguing, in pertinent part, that the individual defendants were entitled to qualified immunity. *See* R. 48 (Corrected Mot. S.J. at 2) (Page ID #458).    Rhodes responded in opposition, *see generally* R. 55 (Response) (Page ID #586), the defendants declined to file a reply, and the district court held a hearing on the motion, during which Rhodes voluntarily dismissed the claims against all defendants except Jones and McPherson, *see Rhodes v. Michigan*, No. 2:17-CV-12416-TGB, 2020 WL 978296, at *2 (E.D. Mich. Feb. 28, 2020).

Ultimately, the district court granted the motion for summary judgment.    Regarding Rhodes's Eighth Amendment claims, the district court concluded that summary judgment was proper as to (i) McPherson, because the evidence, even taken in the light most favorable to Rhodes, did not establish that he was deliberately indifferent to a substantial risk of harm to Rhodes and (ii) Jones, because, although there was a dispute of material fact as to whether Jones was deliberately indifferent, his actions did not violate a "clearly established" constitutional right. *Id.* at *7, 11.    As to Rhodes's substantive-due-process claims, the district court concluded that summary judgment was warranted for both defendants because the state-created-danger

---

[1]Rhodes's first complaint named Michigan and the Michigan Department of Corrections as defendants, but those defendants were dismissed without prejudice pursuant to a joint stipulation. *See* R. 16 (Order at 2) (Page ID #118).

doctrine requires a showing that the injury suffered resulted from violence by a third-party, and her claims were otherwise covered by the Eighth Amendment, not substantive due process. *Id.* at *12–14. This timely appeal followed.

## II. DISCUSSION

### A. Summary-Judgment Standard

"This court reviews de novo the district court's grant of summary judgment." *Garretson v. City of Madison Heights*, 407 F.3d 789, 795 (6th Cir. 2005). "A grant of summary judgment will be upheld only where no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016). To establish the existence of a genuine dispute of material fact, the plaintiff must present "evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (per curiam). "In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the non-moving party." *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 591–92 (6th Cir. 2001).

### B. Qualified-Immunity Standard

"Whether qualified immunity applies to an official's actions is a question of law that this Court reviews *de novo*." *Virgili v. Gilbert*, 272 F.3d 391, 392 (6th Cir. 2001). There are two prongs to a qualified-immunity analysis, which may be considered in any order: "First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?" *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006); *Godawa v. Byrd*, 798 F.3d 457, 462–63 (6th Cir. 2015). By limiting government officials' damages liability to violations of "clearly established" rights, the doctrine of qualified immunity balances—or at least attempts to balance—two practical concerns: (1) that in some circumstances "'action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees'"; and (2) "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the

discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (alteration original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)).

## C. Rhodes's Eighth Amendment Claims

The district court conducted its analysis of Jones's and McPherson's qualified-immunity defense by first asking whether the facts, taken in the light most favorable to Rhodes, made out an Eighth Amendment violation, and then asking whether Rhodes's rights were clearly established. At the first step, the district court concluded that no reasonable juror could find that McPherson violated Rhodes's Eighth Amendment rights but found that there was a genuine dispute of fact as to Jones. It held, however, that Jones did not violate a "clearly established" right. Thus, it granted summary judgment in favor of both defendants. We disagree, and hold that a reasonable juror could find that *both* Jones *and* McPherson violated Rhodes's Eighth Amendment rights, which were clearly established at the time.

### 1. Eighth Amendment Analysis

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citations omitted). Thus, pursuant to the Eighth Amendment's prohibition against "cruel and unusual punishments," U.S. Const. amend. VIII, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)). But not every harm or injury suffered in prison rises to the level of cruel and unusual punishment; "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Id.* at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). "An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

To distinguish actionable conduct from a mere accident, a plaintiff challenging the conditions of their confinement under the Eighth Amendment—whether based on inadequate

medical care, a failure to protect the plaintiff from other inmates, or some other cognizable basis—"must show that the prison officials acted with 'deliberate indifference' to a substantial risk [of] serious harm." *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001). This showing "encompasses both a subjective and an objective component." *Id.* "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 298). "For a claim (like the one here) based on a failure to prevent harm, the inmate must show that [s]he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* Second, the official must have acted with "'deliberate indifference' to inmate health or safety," which is a subjective inquiry into the defendant's state of mind. *Id.* (quoting *Wilson*, 501 U.S. at 302–03); *see Mingus v. Butler*, 591 F.3d 474, 480 (6th Cir. 2010).

It is widely accepted that dangerous prison work conditions can support a viable conditions-of-confinement claim under the Eighth Amendment deliberate-indifference standard. *See, e.g.*, *Ambrose v. Young*, 474 F.3d 1070, 1078 (8th Cir. 2007); *Morgan v. Morgensen*, 465 F.3d 1041, 1045–46 (9th Cir. 2006). Indeed, we have applied the deliberate-indifference framework to Eighth Amendment claims predicated on prison-workplace safety, albeit largely (if not exclusively) in unpublished opinions. *See, e.g.*, *Phaneuf v. Collins*, 509 F. App'x 427, 431 (6th Cir. 2012); *Smith v. Yarrow*, 78 F. App'x 529, 536 (6th Cir. 2003); *see also Tino v. Jones*, 791 F.2d 935 (6th Cir. 1986) ("It is true that, under certain extreme conditions, prison work assignments may constitute cruel and unusual punishment.") (unpublished table decision) (per curiam). Such prison-workplace-safety claims fit neatly within the well-established framework for addressing conditions of prison confinement and, accordingly, Eighth Amendment claims predicated on dangerous prison working conditions are reviewed under the same deliberate-indifference standard as other conditions-of-confinement challenges. Applying the standard here, we conclude that the evidence, when viewed in the light most favorable to Rhodes, makes out a violation of the Eighth Amendment by both Jones and McPherson.

***Objective Component***. The district court concluded that Rhodes's work as a laundry porter satisfied the objective component of the conditions-of-confinement analysis, which asks whether Rhodes's work conditions "pos[ed] a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Jones and McPherson do not appear to challenge this conclusion on appeal, nor

could they.   Working as a laundry porter at MHVCF requires handling laundry carts that can weigh as much as 400 pounds when fully loaded.  These carts, which may be as tall as six feet and must be unloaded using a hydraulic lift gate unequipped with any sort of "stopper" device, are prone to tip.  *See* R. 55-5 (McPherson Dep. at 44) (Page ID #739).  Indeed, Thomas testified that she witnessed laundry carts tip over multiple times.  R. 55-3 (Thomas Dep. at 45–46) (Page ID #670).  The instability of the heavy laundry carts and lack of any safety device to prevent tipping posed a serious danger to the laundry porters standing below, who are expected to control the carts with nothing but their hands.  The testimony of the witnesses to Rhodes's accident— including Jones and McPherson themselves—acknowledging that handling the laundry carts was dangerous confirms that Rhodes's work as a laundry porter entailed an objectively substantial risk of serious harm.  R. 55-4 (Jones Dep. at 34–35) (Page ID #683); R. 55-5 (McPherson Dep. at 20–21) (Page ID #715–16); R. 55-3 (Thomas Dep. at 39) (Page ID #668).

**Subjective Component**.  The district court found that there was evidence that Jones but not McPherson exhibited deliberate indifference to the risk of harm inherent in Rhodes's work as a laundry porter.  "Under this subjective [deliberate-indifference] standard, a prison official cannot be found liable under the Eighth Amendment 'unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  *Mingus*, 591 F.3d at 480 (quoting *Farmer*, 511 U.S. at 837).  "It is . . . fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."  *Farmer*, 511 U.S. at 836.  On appeal, Rhodes argues that the district court reached the correct conclusion as to Jones but erred in concluding that McPherson's conduct did not rise to the level of deliberate indifference.  We agree.

Beginning with Jones, the district court correctly concluded that Rhodes presented sufficient facts from which a reasonable juror could conclude that Jones acted with deliberate indifference, and the defendants do not appear to take issue with the district court's conclusion.  *See* Appellee Br. at 20 ("Defendants agree with the trial court's well-researched and well-written analysis of the law and its application to the facts of this case.").  As the district court recounted,

Jones testified that he would confirm verbally that a laundry porter had control of a laundry cart before he released it. R. 55-4 (Jones Dep. at 30) (Page ID #682). Yet Jones admitted that he did not speak to Rhodes the day of the accident and could not explain why he believed that Rhodes initially had control of the laundry cart before it fell. *Id.* at 30–31 (Page ID #682).**2** Indeed, Thomas testified that Jones was in a rush on the day of the incident and did not take any of his usual precautions to ensure that the laundry porters had control of the carts before he let them go, R. 55-3 (Thomas Dep. at 34–35, 43) (Page ID #667, 669). Not only that, Thomas testified that Jones "flung" the laundry cart that injured Rhodes, rather than following the controlled manner in which he would usually direct the carts. *Id.* at 33–34 (Page ID #667). Because Jones knew—according to his own testimony—that releasing a laundry cart without confirming that the laundry porter had control of it could lead to serious injury yet disregarded that risk when he did exactly that and "flung" the cart that ultimately injured Rhodes, a reasonable juror could find that he acted with deliberate indifference and thus violated Rhodes's Eighth Amendment rights. *See Ambrose*, 474 F.3d at 1078; *cf. Phaneuf*, 509 F. App'x at 432 (no deliberate indifference where defendant had no reason to believe that prison worker's hand was near the soap press that injured her hand).

Turning to McPherson, we hold that the district court erred in concluding that Rhodes failed to present evidence from which a reasonable juror could find that McPherson was deliberately indifferent. Acknowledging Thomas's conflicting evidence on whether McPherson lowered the lift too early causing it to tip onto Rhodes, the district court nevertheless found that McPherson was not deliberately indifferent because Jones testified that McPherson could not see Rhodes from his position because she was in his "blind spot." *Rhodes*, 2020 WL 978296, at *7; R. 55-4 (Jones Dep. at 73–74) (Page ID #693); *see also id.* at 36–37 (Page ID #683–84). In essence, the district court concluded that McPherson could not be deliberately indifferent to the risk of harm to Rhodes because he could not know whether Rhodes had control of the cart before he lowered the lift gate (if, in fact, McPherson did lower the lift gate). But the district court's

---

**2**At another point in his deposition, Jones indicates that Rhodes told him that she had control of the cart, but in light of Jones's conflicting testimony as to whether he and Rhodes communicated before the incident, there is a question of fact for the jury to resolve as to whether Jones had reason to believe that Rhodes had control of the cart when he released it. *See* R. 55-4 (Jones Dep. at 30–31) (Page ID #682).

analysis fails to account for the testimony of McPherson himself, who testified that he saw Rhodes looking to her left when the cart struck her, directly contradicting Jones's testimony that McPherson could not see Rhodes from his vantage. R. 55-5 (McPherson Dep. at 22–23) (Page ID #718–19).

Thus, there is a genuine dispute of fact as to whether (i) McPherson lowered the lift gate too early, causing the cart to tip onto Rhodes and (ii) did so knowing that Rhodes was not paying attention to the cart and did not have control over it. Taken together with McPherson's testimony that he knew that a laundry cart could pose a substantial danger for a laundry porter unprepared to control it, a reasonable juror could conclude that McPherson acted with deliberate indifference if he lowered the cart prematurely, causing it to tip onto the unprepared Rhodes. *See Ambrose*, 474 F.3d at 1078; *cf. Phaneuf*, 509 F. App'x at 432. This conclusion is bolstered by McPherson's testimony that he knew that the carts could tip over if he moved the lift gate too early, his testimony that he knew that the lift gate's lack of a stopper made it more likely for the carts to tip, and his concern about the lack of formal procedures for laundry-porter duties. *See* R. 55-5 (McPherson Dep. at 43–45) (Page ID #738–40). Accordingly, there is a genuine dispute of material fact as to whether McPherson's conduct violated Rhodes's Eighth Amendment rights that precludes summary judgment in his favor.

The dissent disagrees as to both Jones and McPherson. It would hold that the Eighth Amendment is inapplicable to Rhodes's circumstances because she *volunteered* to be a laundry porter—because she was not *compelled* to engage in a dangerous activity. *See* Dissent at 26. The primary problem with the dissent's reasoning is that it lacks a basis in precedent. Nowhere in *Estelle*, *Farmer*, or the Court's other Eighth Amendment jurisprudence does the Court qualify Eighth Amendment conditions-of-confinement protections as does the dissent. To the contrary, those cases establish a clear standard: "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer*, 511 U.S. at 828. As simple as that. The caselaw does not call for the inquiry into voluntariness or compulsion that the dissent would impose.

In any case, the dissent's reasoning fails as a matter of the factual record. Setting aside the significant questions that exist regarding the voluntary nature of anything that happens in

prison**³**—an environment defined by limitations on personal liberty and choice—Rhodes cannot be said to have "volunteered," Dissent at 26, for what happened to her. First, it is unclear whether Rhodes was aware of the dangers inherent in laundry-porter work at MHVCF when she signed up for the job, and voluntariness generally requires a showing that the person doing the "volunteering" knew what they were getting into. *See, e.g.*, *United States v. Martin*, 668 F.3d 787, 792 (6th Cir. 2012) ("For a plea to be voluntary, the defendant must understand the direct consequences of a plea . . . ."). Second, even if Rhodes "volunteered" to be a laundry porter, Dissent at 26, she did not volunteer to have a couple-hundred-pound laundry cart "flung" towards her head while she was looking the other way. Put in terms of compulsion, Jones and McPherson compelled Rhodes to engage in a dangerous activity by their actions if not their words. To be sure, they did not order Rhodes sign up for work as a laundry porter or to turn away before they sent the laundry cart towards her. But a reasonable jury could find that Jones and McPherson knew that Rhodes was not paying attention and took actions—flinging the cart or prematurely lowering the lift gate—that they knew would place Rhodes in serious danger. In doing so, they gave Rhodes "no choice but to keep working" under dangerous conditions that were beyond her control. Dissent at 33. That is nothing if not compulsion. Ultimately, the dissent suggests that Rhodes accepted the risks of being a laundry porter when she signed up for the job and that this assumption of risk insulates Jones and McPherson from liability under the Eighth Amendment. But it is one thing to say that Rhodes accepted some level of risk when she signed up for the job and it is something else entirely to say that by signing up as a laundry porter Rhodes accepted that Jones and McPherson could recklessly disregard those risks as they pleased. The very essence of *Estelle* and *Farmer* is that persons in prison can count on the Eighth Amendment to protect against such abuses.

The dissent gestures at further limitations too, surmising that Rhodes's Eighth Amendment claim is baseless because it does not involve "a significant risk of injury from conditions beyond her control *due to her incarceration*." Dissent at 26. This proffered limitation fails for the same reasons as the first. *Estelle*, *Farmer*, and their progeny simply do

---

**³***See generally Rafferty v. Trumbull County*, 915 F.3d 1087, 1096 (6th Cir. 2019) (discussing the ability of imprisoned persons to consent to sexual relations with prison officials); *Wood v. Beauclair*, 692 F.3d 1041, 1047 (9th Cir. 2012) (same).

not call for such an inquiry into whether there is some connection between the injury and the "unique circumstances of the prison environment." Dissent at 28. Instead, those cases impose upon prison officials an affirmative duty to protect the persons under their supervision against known risks of serious harm without regard for whether the risk is one that is unique to prison. *Farmer*, 511 U.S. at 832 ("[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984))). What is more, as a factual matter, Rhodes, as a *prison* worker, very much faces circumstances unique from those of everyday employees. Common sense tells us that prison workers do not have the same ability to petition their employer for safer working conditions as do ordinary employees or the same ability to complain to their supervisors of workplace issues. Although there is always some power imbalance between employers and employees, it should go without saying that the dynamic is magnitudes more severe in prison and thereby reduces a prison worker's ability to protect themselves from workplace abuses. Just as prison strips a person of some of their agency in seeking medical care, *Estelle*, 429 U.S. at 103, or protecting themselves from assault, *Farmer*, 511 U.S. at 833, it is no stretch to say that prison deprives prison workers of many of the protections that everyday employees enjoy.

Finally, to the extent that the dissent accuses us of elevating every workplace injury and accident to the level of a constitutional violation, it would be proceeding against a straw man of its own making. We do not hold that a mere "workplace *injury* can amount to an unconstitutional punishment just because it happened in a prison" and we do not hold that an "accident" can serve as the basis for an Eighth Amendment violation. Dissent at 31. Indeed, we readily acknowledge that a mere accident could not support a viable Eighth Amendment claim. *See Estelle*, 429 U.S. at 105. But the point of the above analysis is that a reasonable jury could find that what happened to Rhodes was *not* an accident; it was not an everyday workplace injury. The Court's precedent is clear that the deliberate-indifference standard demarcates accidents and ordinary injuries from actionable conduct in the Eighth Amendment context. *See Farmer*, 511 U.S. at 835, 840 (discussing *Estelle*, 429 U.S. at 104–06). Where a prison official's conduct is merely negligent—i.e., where simply an accident has occurred—there is no viable claim. *See Santiago v. Ringle*, 734 F.3d 585, 592 (6th Cir. 2013); *LeMarbe v. Wisneski*, 266 F.3d 429, 435

(6th Cir. 2001). But where a prison official acts with greater culpability—say, with recklessness—we can no more say that only an accident occurred than where an imprisoned person "is in her cell when a fire breaks out" and the "prison guard . . . fails to unlock the cell door." Dissent at 29; *see Farmer*, 511 U.S. at 836. To be sure, after trial on the issue, a reasonable jury *could* find that what happened to Rhodes was an accident—that she suffered a run-of-the-mill workplace injury. If so, her Eighth Amendment claim would fail. But that same jury could also find that Jones and McPherson acted with deliberate indifference, and that is enough for Rhodes to succeed on summary judgment.

Ultimately, the significant flaws in the dissent's reasoning demonstrate that its author is not actually interested in following the analysis that precedent calls for. By presenting our opinion as one divorced from precedent, the dissent has concocted an opportunity to bemoan "just how far the [deliberate-indifference] doctrine has strayed from the Eighth Amendment's original meaning," Dissent at 35, and chastise that "[w]hen doctrine and original meaning diverge, lower courts 'should tread carefully' before extending precedent to new contexts," *id.* (quoting *Garza v. Idaho*, 139 S. Ct. 738, 756 (2019) (Thomas, J., dissenting)). The dissent's approach fails for a few reasons. First, as already explained, our Eighth Amendment analysis falls neatly within the Court's preexisting framework for conditions-of-confinement claims. Indeed, as we will explain in the next section, the framework that we apply, and its application to claims concerning prison work conditions, is so widely accepted among the circuits as to be clearly established. Second, the Court has already rejected the dissent's original-meaning approach in this specific context. In *Estelle*, the Court recognized that the "primary concern of the drafters [of the Constitution] was to proscribe 'torture(s)' and other 'barbar(ous)' methods of punishment" but explained that the Court's "more recent cases . . . have held that the [Eighth] Amendment proscribes more than physically barbarous punishments." 429 U.S. at 102. The Court then reiterated that the Eighth Amendment is not as limited as the dissent here suggests and "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Id.* (internal quotation marks omitted).[4] Third, and more broadly, the purported

---

[4]It is worth noting that to justify its retreat to original meaning, the dissent ignores *Esetelle* in favor of a handful of other dissents. Dissent at 35.

novelty of a factual circumstance is not a license to jettison relevant precedents—and the legal principles that those precedents establish—in favor of a historical analysis of original meaning. Especially in cases like this one, where there is a veritable wealth of authority to guide our analysis, our task is to take the legal principles established by precedent and apply them to the record before us. *See June Med. Servs. L. L. C. v. Russo*, 140 S. Ct. 2103, 2134 (2020) (Roberts, C.J., concurring in the judgment) ("This principle is grounded in a basic humility that recognizes today's legal issues are often not so different from the questions of yesterday and that we are not the first ones to try to answer them."). Here, that analysis leads to the conclusion that Rhodes has presented sufficient evidence to establish that a reasonable jury could find in her favor on her Eighth Amendment claim.

## 2. Clearly Established Right

The next question is thus whether Rhodes's Eighth Amendment right was "clearly established" as of October 15, 2015, the day of her incident. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (internal citation omitted). This case implicates two issues that commonly arise in the clearly established inquiry: (1) at what level of generality should the right in question be defined; and (2) what courts, cases, and parts of cases can clearly establish that right?

Beginning with the first of those issues, the Supreme Court has time and again admonished lower courts "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *see, e.g.*, *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019); *White v. Pauly*, 137 S. Ct. 548, 552 (2017). Thus, general propositions of law are generally (though not always) insufficient to clearly establish a right. *See al-Kidd*, 563 U.S. at 742; *Anderson*, 483 U.S. at 639; *United States v. Lanier*, 520 U.S. 259, 271 (1997) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has

[not] previously been held unlawful.'" (alteration original) (quoting *Anderson*, 483 U.S. at 640)). Rather, "the clearly established law must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at 552 (quoting *Anderson*, 483 U.S. at 640). This does not mean, however, that Rhodes must point to a case "'on all fours' with the instant fact pattern to form the basis of a clearly established right." *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019) (quoting *Hopper v. Plummer*, 887 F.3d 744, 755 (6th Cir. 2018)); *see also Anderson*, 483 U.S. at 640. All that is required is a sufficiently analogous case (or cases) from which a "reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.

Here, the inquiry should focus on whether, at the time of Rhodes's incident, it was clearly established that the Eighth Amendment's conditions-of-confinement protections applied to prison work conditions, such that a reasonable prison official would know that they would violate a prison worker's constitutional rights by knowingly or recklessly disregarding a known excessive risk to the prison worker's health and safety in that environment. This approach is neither too general (as it would be if the right were defined as "the right to be free of cruel and unusual punishments" or "the right against prison officials' deliberate indifference to a substantial risk of serious harm") nor overly specific (as it would be if the right were defined as "the right not to have a prison official recklessly fling a 400-pound laundry cart onto a prison laundry porter").

We took a similar approach to defining the constitutional right for the clearly established inquiry in *LeMarbe v. Wisneski*, 266 F.3d 429 (6th Cir. 2001). There, the plaintiff brought suit against various prison officials alleging that they were deliberately indifferent in violation of the Eighth Amendment to various complications arising after a surgery to remove the plaintiff's gallbladder. *Id.* at 432. After concluding that the facts alleged by the plaintiff made out a cognizable Eighth Amendment conditions-of-confinement claim, we determined that it was clearly established that, if a doctor knows of a substantial risk of serious harm to a patient and is aware that he must either seek immediate assistance from another doctor to prevent further serious harm or must inform the patient to seek immediate assistance elsewhere, and then fails to do in a timely manner what his training indicates is necessary to prevent such harm, that doctor has treated the patient with deliberate indifference. *Id.* at 440. We did not define the right more

specifically by, for example, referring to the particular nature of the plaintiff's medical complications, as such an approach would evidence a "'rigid, overreliance on factual similarity' in analyzing the 'clearly established' prong of the qualified immunity standard." *Baynes v. Cleland*, 799 F.3d 600, 614 (6th Cir. 2015) (quoting *Hope v. Pelzer*, 536 U.S. 730, 742 (2002)).

With the right defined, there remains the question of whether it was clearly established as of October 15, 2015. "To determine whether the law is clearly established 'we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'" *Vanderhoef*, 938 F.3d at 279 (quoting *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019)). "And 'an action's unlawfulness can be "clearly established" from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs.'" *Id.* (quoting *Baynes*, 799 F.3d at 612). Although the Supreme Court has broadly pronounced that the Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates," *Farmer*, 511 U.S. at 832 (quoting *Hudson*, 468 U.S. at 526–27), it has not specifically applied the Eighth Amendment's deliberate-indifference standard to a claim predicated on unsafe working conditions. Thus, Rhodes relies on lower-court precedent to demonstrate that Jones and McPherson violated her clearly established Eighth Amendment rights.

Rhodes immediately finds strong support for her position in our sibling circuits, concentrating on precedent from the Eighth and Ninth Circuits that holds that a prison official's deliberate indifference to a substantial risk of significant harm to prison workers constitutes a violation of the Eighth Amendment. First, Rhodes points to *Ambrose*, where the Eighth Circuit held that the deliberate-indifference standard for conditions-of-confinement claims applied to the "prison work assignment context." 474 F.3d at 1077. Applying that standard, the court concluded that a prison official violated the decedent's Eighth Amendment rights when the official instructed the decedent and other prison workers on a prison emergency-response team to stomp out a brush fire caused by a live power line as part of their storm-cleanup detail. *Id.* at 1073, 1078. The power line, which the prison official knew to be dangerous, electrocuted the decedent just after the work crew had put out the fire. *Id.* at 1074, 1078. Next, Rhodes directs us to *Morgan*, where the Ninth Circuit took the same approach. It applied the Eighth Amendment

deliberate-indifference standard to a claim based on an injury suffered by the plaintiff while working on a defective printing press as a part of his prison job. 465 F.3d at 1045–46. The Ninth Circuit held that the evidence, which, when viewed in the light most favorable to the plaintiff, established that his supervisor was aware of the defect and the risk it posed to the plaintiff but nevertheless instructed the plaintiff to keep using the defective press, made out a violation of the plaintiff's Eighth Amendment rights. *Id.* at 1044, 1046.

The Eighth and Ninth Circuits are far from alone in their holdings. In *Hall v. Bennett*, for example, the plaintiff suffered a "severe electrical shock" after his prison work supervisor instructed him to work on an exposed live wire without protective gloves or other precautions. 379 F.3d 462, 463–64 (7th Cir. 2004). The Seventh Circuit concluded that the plaintiff's Eighth Amendment claim could proceed because, taking the evidence in the light most favorable to the plaintiff, the supervisor was aware of the significant risk associated with working with the live wire, yet required that the plaintiff continue without taking precautions against electrocution, thereby exhibiting deliberate indifference. *Id.* at 464–66. The Tenth Circuit took a similar approach in *Smith v. United States*, holding that an Eighth Amendment claim could proceed where the plaintiff plausibly alleged that prison officials acted with deliberate indifference by directing the plaintiff prison worker to clean out a closet known to contain asbestos. 561 F.3d 1090, 1104–05 (10th Cir. 2009). And more than thirty years ago the Second Circuit held that an allegation that a prison supervisor ordered the plaintiff prison worker to use a ladder known to be unsafe stated a claim for deliberate indifference under the Eighth Amendment. *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987). Thus, at least five federal courts of appeals have all held that prison officials violate the Eighth Amendment where they disregard a known risk to the prison worker's health and safety in the course of their work, thereby displaying deliberate indifference. These decisions came well before Rhodes was injured on October 15, 2015, and Jones and McPherson have pointed to absolutely no authority suggesting that these cases are inconsistent with Supreme Court or other circuit-court precedent.

The district court was not persuaded that this out-of-circuit precedent was sufficient to clearly establish Rhodes's asserted right because, at least in *Ambrose* and *Morgan*, the prison officials "compelled" the prison worker to engage in the dangerous work. *Rhodes*, 2020 WL

978296, at *9–10.  The dissent takes a similar approach.  Dissent at 32–34.  But as we have already explained, even if we accept the premise that the Eighth Amendment calls for some sort of "compulsion" analysis, Rhodes *has* set forth evidence showing that Jones and McPherson "compelled" her to engage in the work that caused her injury.  The evidence, taken in the light most favorable to Rhodes, establishes that:  (1) she was looking away from the laundry truck; (2) Jones and McPherson knew that Rhodes was looking away; and (3) Jones "flung" the laundry cart at Rhodes or McPherson lowered the lift gate early (or both), knowing that their actions carried a significant risk of serious injury to Rhodes.  In these circumstances, Jones and McPherson gave Rhodes "no choice," Dissent at 33, but to "work in a dangerous environment," *id.* at 34; not knowing that the laundry cart was coming towards her, Rhodes was left without enough time to avoid the cart that caused her injuries.  That is compulsion, plain and simple.  Any other approach conflicts with this court's caution that the clearly established right should not be defined too specifically, *Baynes*, 799 F.3d at 614, even if out-of-circuit precedent must be "directly on point" to clearly establish a right, *Barrett*, 130 F.3d at 264.[5]

In cases like this one, where an array of our sibling circuits have acted in concert on an issue, we have not hesitated to hold that out-of-circuit precedent has clearly established a constitutional right.[6]  *See Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 567 (6th Cir. 2016).

---

[5]The district court also distinguished *Morgan* by explaining that it concerned a known defect that exposed the prison worker to a risk of injury.  *Rhodes*, 2020 WL 978296, at *10.  But that distinction fails as a factual matter.  Jones was aware of the work conditions that made laundry-porter work particularly dangerous, such as the lack of a "stopper."  *See* R. 55-4 (Jones Dep. at 14–15) (Page ID #678).  More importantly, he acknowledged that he did not confirm with Rhodes that she was ready for the cart by asking, as he usually did, whether she was ready.  *Id.* at 30–31 (Page ID #682).  As explained above, a reasonable juror could infer that Jones had reason to know that there was a high likelihood that Rhodes was unprepared for the cart based on Jones's failure to follow his usual procedure.  As for McPherson, the issue is more straightforward.  He acknowledged seeing that Rhodes was not paying attention, yet a reasonable juror could find that McPherson lowered the lift anyway, based on Thomas's and Jones's testimony.  *See* R. 55-5 (McPherson Dep. at 22–24, 41, 53) (Page ID #717–19, 736, 748); R. 55-3 (Thomas Dep. at 53) (Page ID #672).

[6]The dissent offers two cases in an attempt to undermine the uniformity of the circuits acting on this question, but neither case does so effectively because they both involve simple prison accidents that all acknowledge cannot serve as the basis for a valid Eighth Amendment claim.  First, the dissent cites *Christopher v. Buss*, where the Seventh Circuit upheld the dismissal of an Eighth Amendment claim predicated on an injury suffered during a prison softball game when a ball hit the plaintiff after an erratic bounce.  384 F.3d 879 (7th Cir. 2004).  Aside from being a case outside the prison-work context (and thus of relatively limited relevance) the claim failed because the conduct at issue—the prison's allegedly poor maintenance of the field—did not involve an objectively substantial risk of serious harm, which distinguishes the case from this one.  *Id.* at 882.  Indeed, *Buss* actually supports our position because it specifically distinguished another Seventh Circuit case involving a cognizable Eighth

Indeed, our own cases foreshadowed this circuit's agreement with the Second, Seventh, Eighth, Ninth, and Tenth Circuit's lockstep approach to Eighth Amendment claims predicated on unsafe prison-working conditions. Consistent with the Supreme Court's broad declarations that the Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates," 511 U.S. at 832 (quoting *Hudson*, 468 U.S. at 526–27), we have applied the Eighth Amendment deliberate-indifference standard to a wide assortment of conditions-of-confinement claims, *see Mingus*, 591 F.3d at 480 (collecting cases). And although we have not yet applied the standard to a case involving unsafe prison-working conditions in a published decision, we have in unpublished opinions. For example, in *Phaneuf* this court considered a plaintiff's claim that her prison work supervisor was deliberately indifferent and violated her Eighth Amendment rights when he activated a soap-press machine and inadvertently severed the plaintiff's fingers. 509 F. App'x at 429–31. This court applied the usual Eighth Amendment deliberate-indifference analysis but concluded that no constitutional violation occurred because the defendant had no reason to think that the plaintiff's fingers were in the machine when he activated it. *Id.* at 432. And in *Smith*, we applied the deliberate-indifference standard to analyze whether prison officials violated the plaintiff's Eighth Amendment rights by forcing him to carry heavy bookshelves as part of his prison job despite knowing the plaintiff suffered from a hernia. *See* 78 F. App'x at 536. When considered alongside the substantial and uncontradicted out-of-circuit precedent, *Phaneuf*, *Smith*, and our broader Eighth Amendment jurisprudence provide strong evidence of the clearly established law.

Together with our cases, the on-point precedent from the Second, Seventh, Eighth, Ninth, and Tenth Circuits, clearly established Rhodes's asserted Eighth Amendment right prior to October 15, 2015. Although none of those cases precisely dealt with factual scenarios where a

---

Amendment claim predicated on workplace safety. *Id.* (distinguishing *Bagola v. Kindt*, 39 F.3d 779, 780 (7th Cir. 1994)). The second case relied on by the dissent, *Wronke v. Champaign County Sheriff's Office*, 132 F. App'x 58 (7th Cir. 2005), is no more helpful than the first. There, the Seventh Circuit again acknowledged the viability of an Eighth Amendment claim predicated on dangerous working conditions but rejected the specific claim at issue because the plaintiff, who was injured when, coincidentally, "a barrel he was filling with laundry separated from its casters and tipped over," failed to show "that the defendants displayed the degree of indifference to [the plaintiff's] health or safety necessary to implicate the Constitution." *Id.* at 60–61. Here, in contrast, a reasonable juror could find that Jones and McPherson acted with the requisite deliberate indifference, and there is a significant and obvious difference between circumstances where a laundry barrel accidentally tips over, apparently of its own accord, and circumstances where a prison official recklessly causes a heavy laundry cart to fall onto a prison worker.

prison official flung a 300–400-pound laundry cart at an unprepared prison worker, the out-of-circuit cases uniformly held liable prison officials exhibiting deliberate indifference to a known risk in an assortment of prison workplaces.  This was sufficient to put a reasonable prison official on notice that their recklessly disregarding a known risk to a prison worker's safety would not just be irresponsible, but would violate that person's right to be free from "unnecessary and wanton infliction of pain" under the Eighth Amendment.  *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 297).  Accordingly, the district court erred in granting summary judgment in favor of Jones and McPherson on Rhodes's Eighth Amendment claims.

### D.  Rhodes's Substantive-Due-Process Claims

The district court rejected both of Rhodes's substantive-due-process claims—one predicated on her right to bodily integrity and the other based on the state-created-danger doctrine.  *See Rhodes*, 2020 WL 978296, at *12–13.  Rhodes, however, addresses only her state-created-danger claim on appeal, arguing that the district court erred when it concluded that the state-created-danger doctrine does not apply where a state actor directly causes the plaintiff's injury, as opposed to where the plaintiff is harmed by the actions of a third party or some other force.  *See id.* at *13–14.  Arguing that the Sixth Circuit has "inconsistently addressed" the requirements for a state-created-danger claim, Rhodes asks the panel to clarify whether a state-created-danger claim is cognizable where a state actor directly causes the plaintiff's injury.  Appellant Br. at 49.  We agree with the district court that the state-created-danger doctrine does not apply where a state actor directly causes the plaintiff's asserted injury.[7]

Applying the state-created-danger doctrine in cases like this one, where a state actor directly causes the plaintiff's injury, would divorce the doctrine from its precedential roots.  We first acknowledged the validity of a state-created-danger claim in *Kallstrom v. City of Columbus*, articulating the standard as follows:  "Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an

---

[7]Jones and McPherson argue only that the district court was correct in holding that no reasonable juror could find that their conduct violated Rhodes's substantive-due-process rights; curiously, they do not argue that they are entitled to qualified immunity because Rhodes's asserted right was not clearly established at the time of the incident.

individual will be exposed to private acts of violence." 136 F.3d 1055, 1066 (6th Cir. 1998). In doing so, we traced the doctrine to *DeShaney v. Winnebago County Department of Social Services*, where the Supreme Court recounted the rule that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual," 489 U.S. 189, 196 (1989), but acknowledged the possibility of an exception for cases where the actions of a state actor increased the risk of harm to the plaintiff, *id.* at 201. Thus, the state-created-danger doctrine tells us when a state actor can be held accountable for harms caused by some external force but does not provide a vehicle for the plaintiff to hold state actors accountable for injuries suffered as a direct result of state action. *See Jones v. Reynolds*, 438 F.3d 685, 695 (6th Cir. 2006) (explaining that injuries caused directly by a state actor would be actionable under constitutional theories, but not under the state-created-danger doctrine). Because Rhodes is seeking to hold Jones and McPherson accountable for their actions that directly caused her injuries, her state-created-danger claim must fail.

Rhodes's arguments do not persuade us otherwise. First, she points to *McQueen v. Beecher Community Schools*, where at one point we summarized the standard from *Kallstrom* as follows: "In *Kallstrom,* we recognized the state-created-danger theory of due process liability and laid out three important requirements: an affirmative act that creates or increases the risk, a special danger to the victim as distinguished from the public at large, and the requisite degree of state culpability." 433 F.3d 460, 464 (6th Cir. 2006). Rhodes argues that our omission of any reference to "private acts" in that selection from *McQueen* signals our willingness to apply the state-created-danger doctrine beyond circumstances where some private third-party is the direct cause of the plaintiff's injury. The first problem with Rhodes's argument is that elsewhere in *McQueen* (indeed, only two sentences later) we quoted directly from *Kallstrom* for the proposition that "[l]iability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to *private acts of violence*." *McQueen*, 433 F.3d at 464 (emphasis added) (quoting *Kallstrom*, 136 F.3d at 1066). Indeed, *McQueen* dealt specifically with private acts of violence—a fatal shooting of one student by another—so it had no reason to consider whether the state-created-danger doctrine applies *only* to injuries caused by private acts of violence. *See id.* at 463. The

second problem with Rhodes's argument is that even assuming that the state-created-danger doctrine is not confined to injuries caused by private third-parties, it does not follow that the doctrine would apply in cases like this one where a state actor directly caused the plaintiff's injuries.  As explained above, the state-created-danger doctrine serves as a mechanism for holding state actors accountable for harms caused by external forces; it does not provide a vehicle for holding state actors accountable for harms they cause directly.  *See Jones*, 438 F.3d at 695.

Indeed, Rhodes has not directed us to a published opinion where we have held a state-created-danger claim to be viable where it is the direct action of a state actor that causes injury, not the actions of a private third-party.  Instead, Rhodes has identified only a single, unpublished decision where we have allowed a state-created-danger claim to proceed that was predicated on an injury caused directly by a state actor:  *Schneider v. Franklin County*, 288 F. App'x 247, 253 (6th Cir. 2008) (state-created-danger doctrine applied where officer ordered plaintiff out of car despite plaintiff's badly dislocated ankle).  As the district court correctly concluded, *Schneider*—which did not explain its reasons for applying the doctrine as it did—is an "anomaly" and should not be followed here, for the reasons already given.  *See Rhodes*, 2020 WL 978296, at *13.

Nor does the Third Circuit precedent on which Rhodes relies, *Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003), support her position.  There, the Third Circuit faced a state-created-danger claim brought by the estate of a decedent who died of an apparent heart attack in the woods behind his home shortly after fleeing a police force that had surrounded his home in what they considered to be a "'barricaded gunman' situation." *Id.* at 503–05.  The court held that the estate's claim could proceed because the police's conduct exacerbated the decedent's known history of psychological and physical health conditions, which was a "fairly direct" cause of the decedent's heart attack. *Id.* at 507.  But it is one thing to extend the state-created-danger doctrine to injuries caused indirectly (or even "fairly direct[ly]") by a state actor—circumstances we are not faced with here—and it is another thing entirely to extend the doctrine to injuries caused by the direct actions of a state actor like the injuries Rhodes suffered as the direct result of Jones's

and McPherson's conduct.[8]    Such an approach is inconsistent with the genesis of the state-created-danger doctrine as an exception to the rule that state actors generally have no duty to protect against external threats.  *See McQueen*, 433 F.3d at 464.

### III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment in favor of Jones and McPherson on Rhodes's Eighth Amendment claim, **AFFIRM** the district court's grant of summary judgment in favor of Jones and McPherson on Rhodes's substantive-due-process claim, and **REMAND** the case for further proceedings consistent with this opinion.

---

[8]To be clear, we are not faced with circumstances like those that the Third Circuit confronted in *Estate of Smith* and cast no judgment upon how a similar case would come out under our precedent.  Nor are we faced with a case where a state actor is alleged to have increased the risk of a suicide, *see Wilson v. Gregory*, 3 F. 4th 844, 858–59 (6th Cir. 2021); *id.* at 863–64 (Stranch, J., concurring), or some other external force that might not be characterized as private.  Our decision today does not foreclose the validity of such claims, nor does it validate them.  In holding only that the state-created-danger doctrine does not apply where a state actor is said to have caused directly the plaintiff's injury, we leave open those questions for future cases to resolve.

—————————————

**DISSENTING IN PART**

—————————————

THAPAR, Circuit Judge, dissenting in part. No one disputes that Kelly Rhodes was seriously injured. And the record suggests the defendants were at fault. That is why we have state tort law—so people can recover for the injuries they suffer at someone else's hand.

And recover Rhodes did: She settled her state tort claims for $50,000 in damages plus the ability to obtain reimbursements for medical expenses related to her head injury. Yet the majority holds that Rhodes's status as an inmate entitles her to special rights.

The majority finds this entitlement in the Eighth Amendment's Punishments Clause. But the Eighth Amendment is not a glorified tort statue. *Ramirez v. Guadarrama*, 2 F.4th 506, 512 (5th Cir. 2021) (Oldham, J., concurring in the denial of rehearing en banc). Nor is it a "National Code of Prison Regulation." *Hudson v. McMillian*, 503 U.S. 1, 28 (1992) (Thomas, J., dissenting). To make out a claim of unconstitutional punishment based on prison conditions, Rhodes needed to show—at a minimum—that the state exposed her to compulsory, involuntary danger. She can't clear this bar because she voluntarily worked in the laundry detail.

The majority suggests that Supreme Court precedent supports the opposite conclusion. It doesn't.

The Court has held that a prison guard's deliberate indifference can amount to punishment when an inmate faces a significant risk of injury from conditions beyond her control *due to her incarceration*. But the Court has never extended that standard to cases like this one, where an inmate volunteered for a dangerous job. Without state compulsion, an inmate working inside a prison has the same rights of recovery as a worker outside the prison's walls. No more, no less.

By reviving Rhodes's Eighth Amendment claim, the majority stretches the Punishments Clause beyond precedent and far beyond its original meaning. Because precedent and history agree that Rhodes's accident was not a punishment, I dissent in part.[1]

I.

Kelly Rhodes was an inmate in a Michigan state women's prison and had a job cleaning the housing unit. Yet she wanted a job as a laundry porter because they received higher pay. Inmates knew the job could be dangerous, but Rhodes still put her name on the waiting list. When her name came up, she accepted the position.

Laundry porters are responsible for exchanging the prison's dirty laundry for clean clothes and linens. Each morning, the laundry porters unload a truck carrying a day's worth of clean laundry. A prison guard stands inside the truck and rolls large bins of laundry (up to six feet tall and sometimes weighing over 400 pounds) onto the truck's liftgate, while another guard lowers the bins to the ground from the liftgate controls. The laundry porters stand on the ground behind the truck and stabilize the bins by hand as they come down. Once the truck is empty, the laundry porters reverse the process to load the prison's dirty laundry.

Rhodes's first day as a laundry porter was uneventful, but the next day was different. Rhodes was still learning the ropes, so she started out the day watching the more experienced laundry porters unload the clean laundry. That day, Richard Jones, an officer at the facility, worked inside the truck while his colleague, Paul McPherson, operated the liftgate controls. After a few bins were unloaded, one of the other laundry porters prompted Rhodes to jump into the rotation. The first couple of bins went fine. But the next one didn't. A laundry porter testified that Jones "flung" a bin onto the truck's liftgate, causing it to tilt toward Rhodes. R. 55-3, Pg. ID 667. It's not clear whether McPherson began to lower the liftgate at this point. In any event, Rhodes tried to stabilize the bin by pushing against it, first with one hand and then with both, as that's what she had seen the more experienced porters do. The other inmates saw the

---

[1]Rhodes also seeks recovery under the Due Process Clause. Since the majority correctly rejects that claim, I join that part of the opinion.

danger unfolding and yelled for Rhodes to get out of the way. It was too late. The bin fell from the liftgate and struck Rhodes, injuring her head and face. She has no memory of the accident.

Rhodes sued in state and federal court to recover for her injuries. In the state case, Rhodes settled most of her state law claims for $50,000. The settlement agreement preserved her federal claims and a claim for future costs of treating her head injury under Michigan's no-fault liability statute. *See* Mich. Comp. Laws § 500.3106(1)(b).

In the federal suit, Rhodes alleged that the prison violated her constitutional right to due process, as well as her Eighth Amendment right to be free of cruel and unusual punishment. The district court dismissed those claims. In its view, the prison guards' conduct was "negligent or arguably reckless," but it did not violate Rhodes's clearly established rights under the Eighth Amendment. R. 57, Pg. ID 863.

## II.

Since prison sentences are punishments, an inmate's term of incarceration must meet the safeguards of the Eighth Amendment. But not everything that happens in prison is a punishment. An inmate gets no special right of recovery under the Eighth Amendment for injuries that could have occurred just as easily outside the prison's walls. The unique circumstances of the prison environment must play a role.

Precedent tells us there are two ways work-related injuries in prison can implicate the Eighth Amendment. First, a judge may violate the Punishments Clause by sentencing an inmate to hard labor without taking measures to ensure the inmate's safety. For example, a judge could not sentence an inmate to work in a coal mine without protective equipment. Second, and closer to this case, a prison guard cannot knowingly force an inmate to work in a dangerous situation without taking steps to mitigate the risk of harm. In either case, an injury must result from a condition of the inmate's confinement—there must be some state compulsion at play. Since there was no state compulsion here, Rhodes has no Eighth Amendment claim.

A.

Punishments are intentional acts.  *See Wilson v. Seiter*, 501 U.S. 294, 300 (1991) ("The source of the intent requirement is not the predilections of [the Supreme] Court, but the Eighth Amendment itself, which bans only cruel and unusual *punishment*.").  But the Court does not use a one-size-fits-all approach for determining intent.  Instead, the standard varies with the circumstances.  *See Whitley v. Albers*, 475 U.S. 312, 320 (1986) (requiring "due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged").

Two hypotheticals help explain how it works.  First, imagine that one inmate is about to attack another.  A prison guard's split-second decision to use force in that instance could only amount to punishment if he acted "maliciously and sadistically for the very purpose of causing harm."  *Id.* at 320–21.  By contrast, imagine that an inmate is in her cell when a fire breaks out. In that case, a prison guard who fails to unlock the cell door could be liable under the Eighth Amendment even if he acted merely with "deliberate indifference" to the danger.  *Wilson*, 501 U.S. at 303; *see also Farmer v. Brennan*, 511 U.S. 825, 836–37 (1994) (applying a criminal-recklessness standard to measure deliberate indifference).

But the deliberate-indifference standard does not apply every time an inmate suffers an injury from hazardous conditions inside a prison.  Instead, under controlling precedent, the inmate must also show that she was exposed to danger as a condition of her confinement.  This requirement can be traced to *Estelle v. Gamble*, the first case to hold that prison conditions can violate the Eighth Amendment.  429 U.S. 97 (1976).  There, the Court emphasized the unique circumstances of inmates, who have no choice but to rely on prison officials for medical care. And the *Estelle* majority reasoned that if the Eighth Amendment barred the state from formally sentencing a defendant to "torture or a lingering death," then it must also prohibit the state from withholding medical treatment that would inflict the same consequences upon the inmate.  *Id.* at 103.

Later cases shared the same emphasis on state compulsion and circumstances unique to the prison setting.  In *Farmer*, for example, the Court held that if an inmate cannot escape some danger because she is imprisoned, officials must act to mitigate the inmate's risk of injury.

The Court told us that "the government and its officials are not free to let the state of nature take its course" after "having stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid." 511 U.S. at 833. And if they deliberately violate that duty and injury results, the Court's precedent allows the inmate to recover damages under the Eighth Amendment.

Indeed, the cases decided between *Estelle* and *Farmer* also involve inmates who were involuntarily exposed to danger by virtue of the prison environment. Since the inmates in those cases were powerless to protect themselves due to their confinement, the Court concluded that the prison officials' deliberate indifference to the inmates' health and safety could support a finding of unconstitutional punishment. *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 54 (1988) (denying an inmate medical treatment); *Wilson*, 501 U.S. at 298 (denying an inmate adequate food, heating and cooling, and other measures of "life's necessities"); *Helling v. McKinney*, 509 U.S. 25 (1993) (exposing an inmate to second-hand smoke).

But the Court has never said that an inmate suffers an unconstitutional punishment when she is accidentally injured after volunteering to participate in a dangerous activity. And that makes sense. After all, when ordinary civilians suffer an injury at the workplace, they must rely solely on state tort law. The same avenue is available when a prisoner suffers an identical workplace injury. Under the majority's view, however, the Eighth Amendment affords a prisoner who volunteers to work the exact same job a second bite at the apple. But nothing in our precedent tells us that an ordinary tort becomes a constitutional violation solely because it took place within a prison.[2] Only when an inmate's unique situation leads to her injury—"Do this or you are going to the hole"—does the Eighth Amendment kick in. *See Christopher v. Buss*, 384 F.3d 879, 882 (7th Cir. 2004) (holding that an inmate's voluntary exposure to danger during a baseball game could not establish an Eighth Amendment violation, even if guards knew the field was dangerous and ignored it); *Wronke v. Champaign Cnty. Sheriff's Off.*, 132 F. App'x

---

[2]Indeed, the Supreme Court declined to find a constitutional violation where government employers were deliberately indifferent to their voluntary employees' safety. *See Collins v. City of Parker Heights*, 503 U.S. 115, 127–28 (1992). Just as substantive due process did not kick in for an employee who "voluntarily accepted an offer of employment," *id.* at 128, the Eighth Amendment does not apply here, where Rhodes could only be exposed to the guards' deliberate indifference in the voluntary workplace context—not as a condition of her confinement.

58, 61 (7th Cir. 2005) ("[An inmate] cannot manufacture a constitutional claim by volunteering for a job when he could have avoided the offending conditions by choosing to stay in his cell."). In short, compulsion is the key ingredient. And without it, the constitutional inquiry must come to a close.

The facts of this case could have come right out of a torts treatise. Rhodes was not engaged in forced labor. She left her old prison job and volunteered to be a laundry porter in exchange for benefits and higher pay. Even on the morning of the accident, Rhodes was not compelled to work. As a new hire, Rhodes started the day watching the more experienced laundry porters unload the bins until a fellow inmate invited her to join the rotation. The prison guards didn't say a word. In short, there was no state compulsion here—Rhodes simply stood in the same shoes as an ordinary worker. And so her rights of recovery are no different from those of an ordinary worker: state tort law.

B.

The majority ignores the fact that Rhodes was not compelled to work as a laundry porter. By doing so, the majority strains the deliberate-indifference standard beyond its logical limits. But that's just the first misstep. The majority next falters by denying qualified immunity for Jones and McPherson. It is not clearly established law that a workplace *injury* can amount to an unconstitutional punishment just because it happened in prison. Thus, qualified immunity should shield Jones and McPherson.

As state officials, prison guards are immune from an inmate's claim for money damages unless their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is clearly established if it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (citation omitted).

To defeat the immunity bar, a plaintiff must identify a Supreme Court case or a published opinion from our circuit that recognizes a rights violation on similar facts. Unpublished orders are not enough since they carry only persuasive authority. *See Key v. Grayson*, 179 F.3d 996,

1000 (6th Cir. 1999) ("[P]re-existing law must dictate, that is, truly compel (not just suggest or allow to raise a question about), the conclusion . . . that what defendant is doing violates federal law in the circumstances." (citation omitted)).  The only exception is when a rights violation is so obvious that any reasonable official would understand what the law forbids without the benefit of a court case.  *See Wesby*, 138 S. Ct. at 590.  And the Supreme Court "has repeatedly told courts not to define clearly established law at a high level of generality."  *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).

The majority concedes that no cases from our circuit clearly establish the rights violation alleged here.  Maj. Op. at 18–21.  That alone should weigh heavily in our analysis.  *See Ohio Civ. Serv. Emps. Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988) (holding that absent "extraordinary" cases, "to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself"); *see also Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020) ("Reasonable officers in this circuit will pay attention to *this court's caselaw*. . . . But we can't expect officers to keep track of persuasive authority from every one of our sister circuits." (emphasis added)).  Yet the majority plows on, relying on a handful of cases from other circuits.  But even these cases miss the mark.  Each of them, like *Estelle* and *Farmer*, involves a prison guard who ordered an inmate into a dangerous situation. That compulsion is missing here.  And that should be enough to end the matter.

Consider the majority's first case, *Ambrose v. Young*.  474 F.3d 1070 (8th Cir. 2007). There, a prison guard ordered an inmate to stomp out a grass fire caused by a downed powerline. Sadly, the inmate died following that order.  In concluding that the guard's conduct violated the inmate's clearly established Eighth Amendment right, the court relied on circuit precedent for the proposition that "prison officials are deliberately indifferent when they knowingly compel an inmate to perform labor that is beyond the inmate's strength, [or] dangerous to his or her life or health . . . ."  *Id.* at 1077 (quotation omitted).  The fact that the prison guard compelled the inmate to approach a live powerline to stomp out the fire was critical.  There was a second prison guard named as a defendant in that case, and the court granted him qualified immunity because the record did "not indicate [that he] participated in any instructions to his crew."  *Id.* at 1079. No compulsion, no punishment.

The majority's other cases likewise involve prison guards who ordered inmates into dangerous situations. So they properly apply the Court's deliberate-indifference standard. In *Morgan v. Morgensen*, the Ninth Circuit held "that a prison official is not entitled to qualified immunity when he *orders* a prisoner to continue operating prison work equipment that the official has been warned and has reason to believe is unnecessarily dangerous." 465 F.3d 1041, 1043 (9th Cir. 2006) (emphasis added). And in *Gill v. Mooney*, the Second Circuit construed an inmate's pro se complaint as alleging an Eighth Amendment violation when a prison guard "ordered" the inmate to continue working on an unsafe ladder over the inmate's objection. 824 F.2d 192, 195 (2d Cir. 1987).

The Seventh Circuit reached a similar conclusion in another case cited by the majority, *Hall v. Bennett*. 379 F.3d 462 (7th Cir. 2004). There, the court denied qualified immunity for a prison guard who refused an inmate's request to shut off the power before repairing an electrical circuit. *Id.* at 463. The guard argued that the inmate could have shut off the power himself. But the court rejected that argument because the inmate "had no ability to exercise this option without [the guard's] permission." *Id.* at 465. Since the inmate had no choice but to keep working, the guard's deliberate indifference to the inmate's safety supported a finding of unconstitutional punishment under the *Estelle-Farmer* line of cases.

But none of this is true in Rhodes's case. No prison official ordered Rhodes into the path of danger. Since Rhodes was new to the job, she started the day on the sidelines, watching her fellow inmates unload the bins as she learned the ropes. It was another inmate, not Jones or McPherson, who invited Rhodes to enter the rotation. If Rhodes did not yet feel comfortable with her new job, she could have refused. No one with authority compelled her to work.

The only case identified by the majority to recognize an Eighth Amendment violation in the prison workplace setting without a clear element of compulsion is *Smith v. United States*. 561 F.3d 1090 (10th Cir. 2009). There, the Tenth Circuit held that an inmate plausibly alleged an Eighth Amendment violation when prison officials deliberately allowed the inmate to work in the presence of asbestos. The court based its conclusion on the fact that the prison officials knew that the inmate's work area contained asbestos, and that they were aware of the accordant health risks. *Id.* at 1105. Since that case came to the court on a motion to dismiss, the circumstances

surrounding the inmate's work assignment are not clear from the opinion. Yet even if the inmate in *Smith* also volunteered for the work assignment conscious of the asbestos risk, a single out-of-circuit case is not enough to *clearly establish* that *Farmer*'s deliberate-indifference standard applies to voluntary prison work.[3]

In any event, the majority says Rhodes *was* compelled to work in dangerous circumstances because Rhodes was not paying attention when Jones and McPherson unloaded the bin. Maj. Op. at 15. But the majority's logic escapes me. How could a prison guard compel an inmate not to pay attention? Rhodes does not allege that Jones or McPherson distracted her at all, let alone deliberately. What's more, the majority hasn't explained why that "compulsion" was due to the unique circumstances of the prison environment. Workplace accidents are an unfortunate but common occurrence. What makes Rhodes any different from a factory worker injured by a supervisor's reckless behavior? Put another way, if Rhodes wasn't forced into a dangerous situation *because she was a prisoner*, what does her injury have to do with the Eighth Amendment's prohibition on cruel and unusual *punishments*? The majority offers no answers.

In short, nothing in the record supports the conclusion that Rhodes was compelled to work in a dangerous environment. Even on the day of the accident, the record shows that the guards didn't order Rhodes to unload a single laundry bin. While all acknowledge that the laundry detail was dangerous, Rhodes volunteered for the position just like an ordinary worker. And she could and did recover just like any worker.

Simply put, absent any evidence that Rhodes was forced into a dangerous circumstance because she was a prisoner, the guards' conduct does not constitute punishment.

---

[3]In fact, as discussed above, there is another out-of-circuit case that suggests the opposite: *Christopher v. Buss*, 384 F.3d at 882. With dueling out-of-circuit precedents, this court certainly should not hold the law is clearly established.

III.

The majority purports to rely on Supreme Court precedent to conclude that a workplace injury in a voluntary setting can amount to cruel and unusual punishment. That is incorrect. But the idea that this question is even debatable shows just how far the doctrine has strayed from the Eighth Amendment's original meaning. *See Hudson v. McMillian*, 503 U.S. 1, 18–20 (Thomas, J., dissenting); *NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers*, 974 F.3d 1106, 1117 (9th Cir. 2020) (Bumatay, J., dissenting). When doctrine and original meaning diverge, courts "should tread carefully" before extending precedent to new contexts. *Garza v. Idaho*, 139 S. Ct. 738, 756 (2019) (Thomas, J., dissenting). In deciding whether government conduct violates the Eighth Amendment, the best place to start is with the text.[4]

The Eighth Amendment says in full: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The text leaves two questions open here. First, does the Punishments Clause regulate the conduct of prison guards? Unlike the First Amendment, which by its terms limits the power of Congress, the Eighth Amendment does not say which government actors it constrains. Second, can an

---

[4]The majority would avoid analyzing the Eighth Amendment's original meaning. But it's worth taking a step back to explain why history is a cornerstone modality of constitutional interpretation. Our Founders took great pains to ensure that our Constitution was a written document. As Chief Justice Marshall famously wrote, "[t]he powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?" *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803). And our charter's "writtenness" has implications for how judges should decide constitutional cases. *See, e.g.*, Randy E. Barnett, *An Originalism for Nonoriginalists*, 45 Loy. L. Rev. 611, 636–38 (1999); *see also* Keith E. Whittington, CONSTITUTIONAL INTERPRETATION 50–61 (1999).

Consider a simple analogy. I discover a long-lost family recipe from the turn of the twentieth century and decide to give it a try. *See* Gary Lawson, *On Reading Recipes . . . and Constitutions*, 85 Geo. L.J. 1823, 1825–34 (1997). If a recipe prescribes one teaspoon of sugar, then there is really no question how much sugar I need (or what I should fill my teaspoon with). *Id.* at 1827. It is irrelevant that the recipe is old. The passage of time does not transform the written recipe's communicative content. And if I am making brownies, salt instead of sugar would turn it into something other than what the person who wrote the recipe envisioned. This timeless principle applies to any piece of writing—and the Eighth Amendment is no different.

What's more, the majority never contests that the current interpretation of the Eighth Amendment is far afield from its original meaning.

accident be punishment?  The historical evidence shows that the Eighth Amendment applies to intentional acts by judges and lawmakers.  It does not apply to accidents involving prison guards.

When we have lost sight of our historical anchor, it is helpful to take a step back and start from the beginning.  As is often the case, our inquiry begins across the Atlantic.  Life was bleak for criminal defendants in sixteenth and seventeenth century England.[5]  Prisoners could expect rough treatment both during trial and upon conviction.  Sometimes the Crown ordered jailers to force a confession by "racking" a prisoner—even though the law did not authorize this type of torture.  4 William Blackstone, COMMENTARIES *326.  Yet the law did authorize other forms of torture.  An English prisoner who refused to enter a plea could face *peine forte et dure* ("strong and harsh punishment"), which involved crushing the stubborn defendant with heavy weights until "he died, or . . . till he answered [by pleading]."  *Id.* at *327.  Defendants sometimes endured this punishment for forty days before giving in or dying.  *Id.* at *328.  And once they gave in, things didn't get much better.  Sentences could be extremely harsh.  Those convicted of a crime might face "the pillory, the stocks, and the ducking-stool," "mutilation or dismembering," and "embowelling alive, beheading, and quartering."  *Id.* at *376–77.  This draconian regime served as a catalyst for reform in England.  John Stinneford, *The Original Meaning of Cruel*, 105 Geo. L.J. 441, 474 (2017); *see also Harmelin v. Michigan*, 501 U.S. 957, 967 (1991).  The reform effort culminated in Parliament passing the 1689 English Bill of Rights, which included the first prohibition on cruel and unusual punishments.

Back in America, the Founders were well aware of the Old World's cruel penal systems.  So when drafting the Constitution, they looked for ways to guard against those abuses.  Patrick Henry expressed concern that without a specific constitutional provision protecting Americans from harsh punishments, Congress "may introduce the practice of France, Spain, and Germany—of torturing, to extort a confession of the crime."  *Debate in Virginia Ratifying Convention*, *in* 3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 447–48 (Jonathan Elliot ed., 2d ed. 1836).  Edmund Pendleton agreed

---

[5]Defendants tended to fare even worse under the "shocking apparatus of death and torment" in continental Europe.  4 William Blackstone, COMMENTARIES *377.  Long after the practice had been banned in England, it was commonplace in France to "use the rack to extort a confession from the accused."  *Id.* at *148.

that government should discard "all the severity of cruel punishment, such as tortures, inquisitions, and the like—shocking to human nature, and only calculated to coerce the dominion of tyrants over slaves." *Debate in Virginia Ratifying Convention*, *in* 3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS 294. Without a constitutional constraint on Congress, Abraham Holmes worried, "racks and gibbets may be amongst the most mild instruments of their discipline." *Debates in the Convention of the Commonwealth of Massachusetts*, *in* 2 THE DEBATES IN THE SEVERAL STATE CONVENTIONS 111.

In response to these concerns, the Anti-Federalists advocated for an explicit limit on the methods of punishments Congress could impose by statute. Taking a cue from the English Declaration of Rights, they proposed adopting our own Bill of Rights to safeguard the liberties of individual Americans. Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning*, 57 Calif. L. Rev. 839, 840 (1969). And the Eighth Amendment's ban on "cruel and unusual punishments" was born.

Early commentators on the American Constitution shed light on how lawyers understood the Eighth Amendment. Specifically, they thought the Punishments Clause curtailed the power of the legislature and the judiciary. Thomas Cooley thought the Punishments Clause regulated two things: (1) "a punishment declared by statute" and (2) punishments for a "new statutory offence" outside the common law.[6] Thomas Cooley, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 329–30 (1868). In William Rawle's view, the Eighth Amendment primarily restrained Congress's discretion, requiring "the legislature not to pass laws inflicting [cruel and] unusual punishments." William Rawle, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 131 (2d ed. 1829). Yet Rawle noted that the prohibition on cruel and unusual punishment "applie[d] equally to the legislative and to the judicial authority." *Id.* at 130–31. How so? The Framers envisioned that, like in England, judges would be bound to "pronounce

---

[6]Unlike the English legal system, from which the Punishments Clause originates, there are no common-law crimes under the American Constitution. Thus, early courts applying the Eighth Amendment had to deal with a provision that was "[w]renched out of its common-law context." *Harmelin*, 501 U.S. at 976 (opinion of Scalia, J.). During this transition, judges continued to use punishments developed at common law as a guide when sentencing. *See Commonwealth v. Wyatt*, 2 Va. (6 Rand.) 694 (Gen. Ct. 1828) (considering judicial practice at common law in concluding that flogging was not cruel and unusual punishment under the Eighth Amendment).

that judgment which the law hath annexed to the crime." 2 William Blackstone, COMMENTARIES *376.

Founding-era judges understood the Eighth Amendment in the same way. In *Barker v. People*, the New York Court of Appeals rejected a challenge to a state statute that made disenfranchisement the punishment for dueling. 20 Johns. R. 457 (N.Y. 1823). The court noted that disenfranchisement was a common punishment for other serious crimes. And since it was already used as a punishment, "it was altogether discretionary in the legislature to extend that punishment to other offences." *Id.*

Thus, there is evidence that early Americans understood the Punishments Clause to limit the legislature's power to define a criminal sentence and the judiciary's power to impose one. But they also knew that not all injuries at the government's hand were punishments. The Founding generation understood punishments to be deliberate acts intended to chastise or deter. *See Wilson*, 501 U.S. at 300 ("This is what the word means today; it is what it meant in the eighteenth century." (quotation omitted)). Dictionaries at the time defined punishment as "[a]ny infliction imposed in vengeance of a crime." 2 Thomas Sheridan, A GENERAL DICTIONARY OF THE ENGLISH LANGUAGE (1780); *see also* 2 Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ("Any pain or suffering inflicted on a person for a crime or offense."). To "impose" or "inflict" harm, and to do so with "vengeance," meant the punisher acted with intent to punish. In other words, accidents didn't count.

In fact, it was the intentional nature of punishments that made the Federalists think the Eighth Amendment was unnecessary. In their minds, since legislators would be subject to the laws they passed, there would be no need for a Bill of Rights protecting individual liberties. Taking away the people's rights would mean taking away theirs too. James Iredell made this point specifically in the context of the Eighth Amendment: "[T]hose who are to make those laws must *themselves be subject to them*." Thus, lawmakers would not make punishments "unnecessarily severe." James Iredell, *Answers to Mr. Mason's Objections to the New Constitution* (1788), *reprinted in* PAMPHLETS ON THE CONSTITUTION OF THE UNITED STATES, 1787–1788, at 360 (Paul Leicester Ford ed., 1888) (emphasis added). Joseph Story also believed that legislators wouldn't pass unduly harsh punishments. In his commentary on the Eighth

Amendment, Story notes, "The provision would seem to be wholly unnecessary in a free government, since it is scarcely possible, that any department of such a government should authorize, or justify such atrocious conduct." 3 Joseph L. Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1896 (1833). But this argument only follows if the Founders understood punishment to mean intentional conduct.

State governments at the Founding also knew that only intentional acts could count as punishments. Many state constitutions had provisions that mirrored the Eighth Amendment. But some went a step further. For example, the citizens of Delaware wanted a constitutional safeguard against dangerous prison conditions as well as inhumane punishments. So they added language to their version of the Eighth Amendment: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted; *And in the construction of [jails], a proper regard shall be had to the health of prisoners*." Del. Const., art. I, § 11 (1792) (emphasis added). If unintended harms from prison conditions were punishment, the additional language would have been superfluous.

This history shows how the Founding generation understood the Punishments Clause. A punishment in the context of the Eighth Amendment meant an intentional act prescribed by a legislature and ordered by a judge as a consequence for committing a crime.

Applying that meaning to this case, it's clear that what happened to Rhodes was not a punishment. For one, neither the legislature nor a judge ordered Rhodes to work on the laundry detail. Second, everyone agrees that the guards did not intentionally harm Rhodes.

Though neither original meaning nor current precedent consider Rhodes's injury punishment, Rhodes could still seek damages just like any other Michigan employee. She did, and she recovered for her injury. But by the majority's lights, the Eighth Amendment transforms prisons into a place where employees get rights above and beyond those of ordinary workers. That was not the meaning of the Eighth Amendment at the Founding. And it is not the meaning today.

\* \* \*

In the last forty years, the Supreme Court has given the Eighth Amendment an expansive reading that goes beyond what its text and history can sustain. But even those decisions appear restrained compared to the majority's innovation. By holding that a reckless workplace injury becomes a constitutional violation when (and only when) it takes place within a prison, the majority accelerates our doctrine's departure from the Punishments Clause's original meaning. I respectfully dissent.