NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0337n.06

No. 22-5982

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| ESTATE OF NICHOLAS EUGENE MCMAIN, by and through Angie Bullock, Administratrix of the Estate of Nicholas Eugene McMain, <br><br>      Plaintiff-Appellant, <br><br> v. <br><br> CITY OF HARTFORD, KENTUCKY; JASON GEARY, Individually; CHAD C. WOOD, Individually; GERRY WRIGHT, Individually; UNKNOWN DEFENDANTS; GEORGE CHINN, Individually; JEAN NOFFSINGER, Individually, <br><br>      Defendants-Appellees. | **FILED** <br> Jul 21, 2023 <br> DEBORAH S. HUNT, Clerk <br><br><br> ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY <br><br><br> OPINION |

Before: MOORE, GIBBONS, and BUSH, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Nicholas Eugene McMain tragically died from head injuries sustained in a fall from a garbage truck while on work-release duty during his incarceration at the Ohio County Detention Center ("OCDC") in Hartford, Kentucky. McMain's estate alleged that the City of Hartford along with several individual defendants employed by the city or by OCDC violated McMain's Eighth Amendment rights as a result of their deliberate indifference to McMain's health and safety. McMain's estate also raised several related claims under Kentucky state law. The district court granted summary judgment to all defendants on all claims. For the reasons that follow, we **AFFIRM** the judgment of the district court.

# I.  BACKGROUND

McMain entered OCDC custody on April 17, 2018.  R. 74-6 (Ky. Court Order at 1) (Page ID #825).  During the intake process, McMain disclosed to OCDC that he had been diagnosed with schizophrenia and was taking eleven or twelve prescription medications, mostly to control that condition.  R. 76-4 (Medical Intake Questions) (Page ID #971); R. 74-5 (Medication Reconciliation) (Page ID #824).  According to McMain's mother, Angie Bullock, he also suffered from Scheuermann's disease, which caused a deformity in his spine and an increased heart rate.  R. 76-2 (Bullock Dep. at 34–35) (Page ID #964–65).  McMain also took medication to control his blood pressure and breathing.  *Id.* at 35 (Page ID #965).  McMain was released from OCDC custody for one weekend out of every month so that he could receive an injection medication for his schizophrenia.  *Id.* at 52 (Page ID #967).  According to Bullock, the injection medication ought to have been given every three weeks instead of every month, but the state judge in McMain's case did not allow him to be released that frequently.  *Id.*

At the time of McMain's incarceration, OCDC had a work-release policy in place that provided that "[s]entenced inmates who perform community service work as authorized by KRS 441.068[1] may receive rewards in the form of sentence reductions or other privileges."  R. 74-9 (OCDC Pol'y XI-200 at 2) (Page ID #854).  The work-release program operated through an informal arrangement with the City of Hartford wherein city employees would request a number of incarcerated individuals from the jail each morning to work on various tasks.  R. 66 (Wright

---

[1]The relevant statute was renumbered after the OCDC policy was issued but prior to McMain's death.  *See* KY. REV. STAT. § 441.125 (2018).  The statute requires that "[e]ach jailer shall write a policy governing prisoners working on community-service-related projects, which shall be submitted to the fiscal court for approval."  *Id.* § 441.125(2).

Dep. at 50–51, 55–56) (Page ID #453–54, 458–59). The city employees were responsible for training the incarcerated workers. *Id.* at 56 (Page ID #459). Gerry Wright, the elected Ohio County jailer, approved McMain to participate in the work-release program. *Id.* at 31 (Page ID #434). Wright knew that McMain took medication, but "didn't know what [McMain] was taking." *Id.* at 11 (Page ID #414). He also apparently had not read McMain's medical file and did not know that McMain had schizophrenia or breathing problems. *Id.* at 33, 54 (Page ID #436, 457). Wright could recall only one prior injury occurring during the work-release program, when an incarcerated person was stuck by a needle in a garbage bag while on trash duty. *Id.* at 51 (Page ID #454).

On September 4, 2018, Wright approved McMain for the work-release program. *Id.* at 34 (Page ID #437). McMain and Jacob Fuqua, who was also incarcerated at OCDC, were sent out to pick up trash. R. 74-15 (1st Fuqua Statement) (Page ID #899). According to Fuqua, McMain got "dizzy" and then "just fell over" and told Fuqua that his "chest fe[lt] weird." *Id.* After they returned to OCDC, McMain told Fuqua that he did not want to tell anyone what had happened "because he didn't want to lose his work detail." *Id.* Kenneth Jameson, an OCDC deputy jailer, testified that after they returned, Fuqua told him that McMain had "got a little lightheaded and had to sit down and rest a couple of times." R. 68 (Jameson Dep. at 5) (Page ID #512). Jameson assumed McMain felt unwell due to the heat and told him to "drink water, stay hydrated, [and] get some rest." *Id.* at 7 (Page ID #514). McMain told Jameson that "he was fine." *Id.* at 8 (Page ID #515). Jameson was aware that McMain had schizophrenia and was on several medications. *Id.* at 9–10 (Page ID #516–17). Wright testified that he did not know about McMain's medical incident on September 4 until after McMain died. R. 66 (Wright Dep. at 28) (Page ID #431).

3

McMain never received medical attention for the incident on September 4. *Id.* at 30 (Page ID #433).

On September 5, Deputy Jean Noffsinger approved McMain to work on a garbage truck, picking up trash in Hartford. R. 66 (Wright Dep. at 31–32) (Page ID #434–35). Wright was not working that morning and did not know that Noffsinger had approved McMain to work on the garbage truck until after McMain's death. *Id.* According to Noffsinger, there were two incarcerated people who usually went out on the garbage truck, but one of them had court that day, so McMain took his place. R. 67 (Noffsinger Dep. at 10) (Page ID #477). Noffsinger did not know McMain, had minimal prior interaction with him, and was unaware of his medical conditions. *Id.* at 14–15, 18–19 (Page ID #481–82, 485–86). Noffsinger also did not know about McMain's medical incident on September 4. *Id.* at 20 (Page ID #487).

Chad Wood, a maintenance worker for the City of Hartford, picked up McMain and another incarcerated worker, Sam Durbin, from OCDC at approximately 6:00 a.m. on September 5. R. 65 (Wood Dep. at 21) (Page ID #370). According to Wood, OCDC never informed him that McMain had any mental-health conditions or that McMain had suffered a medical incident while on a work detail the day prior. *Id.* at 24–26 (Page ID #373–75). Wood testified that he provided McMain and Durbin with work safety gloves and checked that McMain had good grip in his hands. *Id.* at 22–23 (Page ID #371–72). McMain told Wood that his grip was good and that he could hang onto the garbage truck with no issues. *Id.* at 23 (Page ID #372). Wood trained McMain on mounting and dismounting the truck safely. *Id.*

At approximately 6:15 a.m., Wood, McMain, and Durbin started the garbage route. *Id.* at 27 (Page ID #376). Wood drove the truck, while Durbin stood on a platform on the rear

passenger's side of the truck and McMain stood on a platform on the rear driver's side. *Id.* at 28–29 (Page ID #377–78). During a stop for a water break, McMain told Wood that he had worked on a garbage truck for the city before. *Id.* at 46 (Page ID #395). Approximately an hour and forty minutes into the route, Wood took a turn off the highway, up a slight incline. *Id.* at 29, 34 (Page ID #378, 383). As the truck approached the turn, Wood "look[ed] in both mirrors" and saw that McMain and Durbin were both still on the truck. *Id.* at 28 (Page ID #377). While turning, however, "something got [his] attention" and Wood "looked in [his] driver side mirror" and could no longer see McMain on the truck. *Id.* at 29 (Page ID #378). Wood stopped the truck, got out, and saw McMain lying in the highway. *Id.* Wood sent a radio message to his supervisor, Jason Geary, and asked him to call 911. *Id.* at 30 (Page ID #379).

Susan Matthews, a nurse practitioner, was driving behind the garbage truck on the morning of September 5. R. 69 (Matthews Dep. at 12) (Page ID #536). Matthews saw McMain standing on the rear driver's side of the truck. *Id.* at 13 (Page ID #537). She estimated that the truck was initially going at approximately 35 miles per hour, but slowed to 25 miles per hour to make a turn. *Id.* at 15 (Page ID #539). As the truck turned right, Matthews saw that McMain seemed to have "lost his grip, did almost a pirouette and fell into the highway." *Id.* at 16 (Page ID #540). She did not observe McMain looking like he was in distress or losing his grip prior to the fall. *Id.* at 17 (Page ID #541). She also did not observe anything unusual or dangerous about the vehicle's turn. *Id.* at 18 (Page ID #542). Matthews pulled over to render aid to McMain, and observed that he was breathing, but he had blood coming from his mouth, nose, and ears. *Id.* She told one of the other workers on the garbage truck to call 911. *Id.* Matthews testified that McMain was not

wearing goggles or a helmet, and that she did not believe that he had gloves or a vest on. *Id.* at 23, 41 (Page ID #547, 565).

McMain was transported to the Ohio County Hospital and then LifeFlighted to Vanderbilt University Medical Center in Nashville, Tennessee. *Id.* at 26 (Page ID #550); R. 37 (2d Am. Compl. ¶ 13) (Page ID #188); R. 66 (Wright Dep. at 48) (Page ID #451). McMain died that afternoon. R. 37 (2d Am. Compl. ¶ 13) (Page ID #188).

McMain's estate sued the City of Hartford, Geary, Wood, Wright, Noffsinger, George Chinn, who is the Mayor of Hartford, and unknown defendants, alleging that their actions violated McMain's Eighth Amendment rights. *Id.* ¶ 24 (Page ID #190). The estate also alleged that the defendants denied McMain substantive due process,[2] violated Article 2 of the Kentucky Constitution, and were negligent resulting in McMain's wrongful death. *Id.* ¶¶ 24, 28–32 (Page ID #190–91). The district court dismissed the claims against Noffsinger as time-barred. R. 44 (Op. & Order at 5) (Page ID #239). Following the close of discovery, the remaining defendants moved for summary judgment. R. 70 (Wright Mot. Summ. J. at 1) (Page ID #572); R. 72 (City Defs. Mot. Summ. J. at 1) (Page ID #737). The district court granted summary judgment to all defendants on all claims. R. 84 (Op. & Order at 2) (Page ID #1121).

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's grant of summary judgment. *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012). Summary judgment is proper "if the movant shows that

---

[2]The district court held that McMain's estate "effectively abandoned" the substantive-due-process claims at the summary-judgment stage. R. 84 (Op. & Order at 6 n.4) (Page ID #1125). Because the estate also does not mention those claims in its briefing on appeal, we do not consider them.

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We must "consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Back*, 694 F.3d at 575 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## B. Qualified-Immunity Standard

All individual defendants assert that they are entitled to qualified immunity. "Whether qualified immunity applies to an official's actions is a question of law that this Court reviews *de novo*." *Virgili v. Gilbert*, 272 F.3d 391, 392 (6th Cir. 2001). We have explained that "[t]here are two prongs to a qualified-immunity analysis, which may be considered in any order: 'First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?'" *Rhodes v. Michigan*, 10 F.4th 665, 672 (6th Cir. 2021) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). In *Rhodes*, we held that, prior to the time of McMain's death, it was already "clearly established that the Eighth Amendment's conditions-of-confinement protections applied to prison work conditions, such that a reasonable prison official would know that they would violate a prison worker's constitutional rights by knowingly or recklessly disregarding a known excessive risk to the prison worker's health and safety in that environment." *Id.* at 679–80. Because that right was clearly established at the time of McMain's death, we next consider whether the defendants' conduct violated McMain's Eighth Amendment rights.

## C. Eighth Amendment Claims

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the

conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citations omitted). "It is not, however, every injury suffered by one prisoner . . . that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834.

We have held that, in order "[t]o distinguish actionable conduct from a mere accident, a plaintiff challenging the conditions of their confinement under the Eighth Amendment . . . 'must show that the prison officials acted with "deliberate indifference" to a substantial risk [of] serious harm." *Rhodes*, 10 F.4th at 673 (quoting *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001)) (second alteration in original). The requisite showing "encompasses both a subjective and an objective component." *Curry*, 249 F.3d at 506. First, the plaintiff "must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. "Second, the official must have acted with '"deliberate indifference" to inmate health or safety,' which is a subjective inquiry into the defendant's state of mind." *Rhodes*, 10 F.4th at 674 (quoting *Farmer*, 511 U.S. at 834). "It is widely accepted that dangerous prison work conditions can support a viable conditions-of-confinement claim under the Eighth Amendment deliberate-indifference standard." *Id.*

### 1. Chad Wood

McMain's estate argues that Wood's failure to inquire into McMain's health and failure to train McMain adequately constituted deliberate indifference to McMain's health and safety. First, Wood's unrebutted testimony was that he had no knowledge of McMain's health conditions or of McMain's medical incident the day prior to the accident. R. 65 (Wood Dep. at 24–26) (Page ID #373–75). Although Wood never inquired about McMain's health, *id.* at 20 (Page ID #369), there

was no reason for him to do so, and not doing so did not constitute a reckless or knowing disregard for McMain's safety. This is particularly true given that McMain himself told Wood that he was "good" to hang onto the garbage truck and did not indicate that he had any health problems that might impact his ability to do the job safely. *Id.* at 44 (Page ID #393). Wood did not observe anything to suggest that McMain was physically or mentally unable to work on the garbage truck. *Id.* In these circumstances, we cannot say that Wood was deliberately indifferent to McMain's safety by failing to inquire further about his health.

Second, Wood testified that he trained McMain on mounting, dismounting, and staying on the truck safely and provided McMain with work safety gloves prior to starting the garbage route. *Id.* at 22–23 (Page ID #371–72). McMain's estate suggests that further training was necessary for McMain's safety, but it fails to provide any details of what that training would be or why it would have prevented McMain's fall. Although Wood's training of McMain was admittedly short, and lengthier training may well have been advisable, it is difficult to say that by not doing so Wood "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm." *Farmer*, 511 U.S. at 846. This is particularly true given Wright's testimony that there had been only one prior injury, an accidental needle stick, in the entire time that the work-release program had been operating. R. 66 (Wright Dep. at 51) (Page ID #454). Because there was no prior history of unsafe conditions or injuries, there is nothing to suggest that Wood recklessly or knowingly disregarded a risk to McMain's safety.

**2. Jason Geary and George Chinn**

First, the estate argues that Geary and Chinn "knowingly acquiesced in the unconstitutional conduct of [their] employees." Appellant Br. at 32. Because we conclude that Wood's conduct

was not unconstitutional, this argument fails. *See McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006) ("[A] prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor."). Second, the estate's remaining arguments regarding Geary and Chinn are not entirely clear but seem to imply that they ought to have implemented safety measures or training policies to protect incarcerated workers. These arguments fail too, for the same reason that the estate's claims against Wood fail. Although it may be sensible to implement more thorough safety and training policies, there is nothing to suggest that doing so would have prevented McMain's tragic death. And, again, the lack of prior injuries or unsafe conditions in the work-release program suggests that neither Geary nor Chinn recklessly or knowingly disregarded risks to McMain's safety.

### 3. Gerry Wright

First, the estate argues that, as with Geary and Chinn, Wright is liable under a supervisory theory. Appellant Br. at 36. The estate, however, fails to allege any unconstitutional conduct by a subordinate of Wright. *See McQueen*, 433 F.3d at 470. And even if we agreed that Wood counts as Wright's subordinate, we conclude that Wood's conduct was not unconstitutional. Thus, Wright has no supervisory liability.

Second, the estate argues that Wright was deliberately indifferent by failing to implement written policies or provide training programs and safety equipment for the work-release program. Appellant Br. at 36–38. These claims fail for the same reasons that the training-related claims against Wood, Geary, and Chinn fail. There is nothing in the record to suggest that having OCDC provide training would be safer than having the city's maintenance department provide training. If anything, such a claim seems counterintuitive because the maintenance department is likely

better positioned to train individuals on garbage-truck safety than OCDC, given that there is no evidence that any OCDC employees have experience working on a garbage truck. Likewise, there is no evidence that written policies or procedures would have prevented McMain's accident, nor does the estate provide any details as to what such policies should entail. And again, the history of the relative safety of the work-release program suggests that Wright did not recklessly or knowingly disregard risks to McMain's safety by failing to implement safety policies or procedures.

Finally, the estate seems to imply that Wright should not have approved McMain for the work-release program given his medical conditions. Appellant Br. at 39. Although Wright was aware that McMain took several medications, he apparently did not know the details of McMain's medical conditions. R. 66 (Wright Dep. at 11, 33, 54) (Page ID #414, 436, 457). It seems obvious that it would be good practice for Wright to ensure that incarcerated individuals do not have serious medical conditions before approving them for work-release to ensure their safety. The estate, however, has not provided any evidence to show that any of McMain's conditions or medications posed the risk of side effects substantial enough that it would be obviously dangerous for McMain to work. Nor is there any evidence that McMain's conditions or medications caused McMain's fall. The sole piece of evidence that might suggest a medical connection is the fact that McMain apparently felt dizzy and may have passed out or been lightheaded while working on September 4. R. 74-15 (1st Fuqua Statement) (Page ID #899). But Wright did not know about that incident until after McMain's death, so Wright did not recklessly or knowingly disregard a risk to McMain's safety by allowing him to work on September 5. R. 66 (Wright Dep. at 28) (Page ID #431). This is especially true given that McMain himself wanted to work and did not indicate to

anyone at OCDC that it would be unsafe for him to do so. *Id.* at 26, 52 (Page ID #429, 455); R. 68 (Jameson Dep. at 6–8) (Page ID #513–15).

### 4. City of Hartford

First, because we conclude that there was no unconstitutional conduct by any city employee, the city has no municipal liability based on the actions of its employees. *See McQueen*, 433 F.3d at 471. Second, we disagree that a failure-to-train claim should prevail. The estate cites *Ouza v. City of Dearborn Heights*, 969 F.3d 265 (6th Cir. 2020), for the proposition that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 287 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). As we explained in *Ouza*, in the context of municipal liability:

> To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.

*Id.* at 286–87 (quoting *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). The estate's claim fails because there is no evidence that the lack of adequate training caused or was closely related to McMain's fall. Likewise, although the training could have been lengthier, the estate provides nothing to suggest that the training was inadequate. It points to no details or issues that Wood did not cover that should have been addressed. Because the estate has failed to address several of the necessary elements of a municipal-liability claim, the district court properly granted summary judgment to the City of Hartford.

### D. State-Law Claims

McMain's estate also raised claims under the Kentucky constitution and Kentucky negligence law. Although "a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims," *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006), the district court addressed the merits of the estate's state-law claims, explaining that judicial economy warranted resolving them, R. 84 (Op. & Order at 13) (Page ID #1132). The district court found that the defendants were entitled to qualified immunity under Kentucky law, and that in the alternative, the defendants were not negligent. *Id.* at 14 (Page ID #1133). The district court further found that no cause of action existed under Kentucky law for constitutional damages, thus foreclosing the estate's claims pursuant to the Kentucky constitution. *Id.* at 16 (Page ID #1135). We conclude that the district court appropriately exercised its jurisdiction and correctly resolved the estate's state-law claims.

On appeal, the estate fails to show how the district court erred in resolving its state-law claims, offering a bare bones argument that qualified immunity under Kentucky law ought not to apply to the defendants because their actions were ministerial and not discretionary. Appellant Br. at 44. The estate then attempts to rely on the same evidence supporting the deliberate indifference claims to demonstrate that the defendants were negligent. Appellant Br. at 46–48. Regardless of whether qualified immunity applies, the estate's negligence claims fail on the merits for the same reasons the deliberate indifference claims fail, as explained at length *supra* parts II.C.1–4.

Under Kentucky law, "[a] common law negligence claim requires proof of (1) a duty owed by the defendant to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury." *Wright v. House of Imports,*

*Inc.*, 381 S.W.3d 209, 213 (Ky. 2012). The estate's claims falter on both the breach and causation prongs. As explained above, the estate has provided no evidence to suggest that the defendants' failure to provide additional training to McMain was negligent or that it caused him to fall from the garbage truck. The estate also contends that the defendants negligently failed to provide McMain with safety equipment, but Wood testified that he provided McMain with work safety gloves. R. 65 (Wood Dep. at 22) (Page ID #371). And there is nothing to suggest that a lack of safety equipment caused McMain's injuries.

Wright was not negligent in approving McMain for work duty, because he did so before McMain's medical incident on September 4, with no knowledge of McMain's medical conditions. R. 66 (Wright Dep. at 11, 33, 54) (Page ID #414, 436, 457). Even if Wright was negligent in failing to check McMain's medical history prior to approving him for work duty, there is no evidence to suggest that any of McMain's medical conditions or medications posed the risk of side effects substantial enough that McMain could not work safely, nor is there any evidence that McMain's conditions or medications caused his fall. The estate also seems to imply that Wood may have been negligent in driving the garbage truck, which is unsupported by the evidence. Both Wood and Matthews testified that Wood drove at an appropriate speed and was turning safely when McMain fell from the truck. R. 65 (Wood Dep. at 33–34, 37) (Page ID #382–83, 386); R. 69 (Matthews Dep. at 14–18) (Page ID #538–42). There is nothing to suggest that Wood drove negligently or that his driving caused McMain's fall.

Finally, the estate fails to brief any arguments regarding its Kentucky constitutional law claim. In any event, the district court correctly concluded that no cause of action exists under Kentucky law "to provide money damages for constitutional violations." *St. Luke Hosp., Inc. v.*

*Straub*, 354 S.W.3d 529, 537 (Ky. 2011).  The Kentucky Supreme Court has explained that the appropriate remedy for the violation of an individual's "rights under the Kentucky Constitution" lies in the form of "traditional tort actions." *Id.* at 538.  Thus, the district court correctly granted summary judgment to the defendants on the estate's state-law claims.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.